# Affidavit

I, Detective Richard A. J. Dalrymple, of the Laurel County Sheriff's Office (Laurel SO), London, Kentucky, being properly deputized as a Task Force Officer (TFO) of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, state the following information to be true to the best of my knowledge, information, and belief:

1. I am a Detective with the Laurel SO, and have been so employed for 23 years. Further, I am a properly deputized TFO with the DEA, and have been so employed for approximately 16 years. I have been assigned to the London, Kentucky DEA Resident Office since July of 2002. My duties since joining the DEA have consisted entirely of investigating drug trafficking and related offenses. Through my training and experience, I am knowledgeable of the patterns, methods, and jargon used by drug traffickers.

2. I have personally conducted or assisted in more than two hundred (200) investigations of alleged criminal violations of the Controlled Substance Act. I have also attended various in-service training seminars on drug trafficking, asset forfeiture, gangs, and money laundering.

3. I have personally conducted and supervised the investigation discussed herein, which is the subject of this affidavit, and I am familiar with the facts outlined below. The facts and information contained in this affidavit are based upon my personal knowledge, as well as the investigation and observations of other law enforcement officers involved in this investigation, including other Special Agents (SAs) and TFOs of the DEA, and other Federal, State, and local law enforcement officers.

1

4. This Affidavit contains information that was provided by a confidential source of information. The cooperating individual, irrespective of true gender, will be referred to below in the masculine gender.

5. Based on my training and experience, I am aware of the following facts:

(A.) The distribution of controlled substances requires those involved to deal with large sums of United States currency and, in many instances, to incorporate a record-keeping system to track the amount of drugs "fronted" to, and monies owed from, lower-level distributors, typically referred to as "drug ledgers." These ledgers, which identify suppliers, dealers, and consumers of controlled substances, as well as the assets obtained through the profits of drug distribution, are often a necessary part of the distribution network.

(B.) The distribution of controlled substances also requires those involved to utilize certain items and/or materials to assist in processing and packaging drugs for distribution, typically referred to as "drug paraphernalia." Some of these items/materials include, but are not limited to: large amounts of plastic Ziploc- type bags; plastic wrap; Pyrex-type containers; electronic digital or triple beam balance scales; cutting agents; mixing bowls; and knives or razors.

(C.) Individuals involved in the trafficking of controlled substances will often have in their possession, or at their residence, firearms to protect and secure their property, to include controlled substances, United States currency, and/or other assets/drug proceeds.

(D.) Individuals involved in the trafficking of controlled substances often conceal controlled substances, United States currency, items used in the distribution of controlled substances, and firearms at the addresses where they live.

(E.) Individuals involved in the trafficking of controlled substances routinely use wireless/cellular telephones to facilitate their drug trafficking business, including, but not limited to, the use of the SMS/text messaging feature that is available on most wireless/cellular telephones, in order to contact suppliers and customers of narcotics. Moreover, these individuals often use coded language and/or coded text messaging in an attempt to disguise, hide, limit, and/or conceal communication regarding the illegal sale of narcotics. Further, these individuals will routinely keep the actual wireless/cellular telephone device and billing and account records for their wireless/cellular telephone service in their residences.

(F.) That persons possess in their residences, other property and vehicles over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, receipts, checkbooks, personal identification documents, notes, and other correspondence, utility bills, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine introductions, photographs, and undeveloped photographic film containing photographs (when developed) of themselves occupying the property and vehicles.

(G.) Drug traffickers often maintain in their residences and/or business establishments computerized (both hard drive and diskettes) or written books, records, receipts, notes, ledgers, airline tickets, cashier's checks, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.

(H.) It is common for drug traffickers who are aware of an ongoing criminal investigation into their drug activities to continually alter their operational methods of drug importation and distribution in order to hinder the efforts of law enforcement agencies from detecting their unlawful activities.

(I.) It is common for drug traffickers to conceal within their vehicles, residences, or businesses, or within the curtilage of their residences or businesses, caches of drugs, large amounts of United States currency, firearms, financial instruments, precious metals, gems, jewelry, electronic equipment, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made in drug trafficking activities.

(J.) When drug traffickers amass large proceeds from the sale of drugs, it is common for these drug traffickers to attempt to legitimize these profits. To accomplish this goal, drug traffickers often utilize domestic banks and their attendant services including safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

**Background of Investigation**

5. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact or matter observed by me or known to the United States. The following information is provided to establish probable cause for the search of the residence of Marti Jean Smith (Marti), located at 1222 Vista Ridge Way, Apartment 102, Knoxville, Tennessee, more fully described in Attachment A hereto, for evidence related to violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, the distribution of methamphetamine, and conspiracy to distribute methamphetamine.

(A.) On April 15, 2018, Will Mitchell (Mitchell) was arrested by the Whitley County Sheriff's Office (Whitley SO) and was found to be in possession of approximately one (1) pound of crystal methamphetamine (meth). On April 18, 2018, I interviewed Mitchell at the Whitley County Detention Center in the company of other law enforcement officers. Mitchell

4

stated he had been purchasing meth for approximately three (3) months from an individual he identified as Tim Thornton (Thornton) of Corbin, Kentucky. Mitchell further stated he (Mitchell) had accompanied Thornton to Knoxville, Tennessee, on two (2) separate occasions to meet with Thornton's primary source of supply, a female Mitchell knew only as "Marti," to obtain large quantities of meth. Mitchell stated that the two (2) trips he made resulted in him receiving at least four (4) ounces of meth on each occasion.

(B.) Thornton was arrested shortly after the second trip he made with Mitchell. According to Mitchell, he then began dealing directly with Marti. Mitchell stated that he made two (2) subsequent trips on his own to purchase meth from Marti. On the first trip, Mitchell stated that he purchased one (1) pound of meth for $6,000. On the second trip, Mitchell purchased two (2) pounds of meth for $11,000. Mitchell stated that the two (2) pound transaction occurred just two days prior to his arrest on April 15, 2018, that is, on or about April 13, 2018. Mitchell stated that both of these transactions occurred at Marti's residence, an apartment in Knoxville, Tennessee. Mitchell provided officers with access to his wireless/cellular telephone, which he stated contained text message conversations between him and Marti, as well as GPS directions to Marti's apartment.

(C.) On April 19, 2018, Mitchell accompanied myself and other law enforcement officers to the apartment complex located at 1222 Vista Ridge Way, Knoxville, Tennessee, where Mitchell identified a silver Dodge pick-up that he had known Marti to drive. Mitchell then pointed out the specific building and apartment where Marti lived within the complex. On this same date, law enforcement utilized several open source and law enforcement databases to corroborate that a female by the name of "Marti Jean Smith" lists 1222 Vista Ridge Way, Apartment 2, Knoxville, Tennessee, as her residence. Mitchell was also able to identify

5

Marti from her operator's license photo. Later, on April 24, 2018, Knoxville DEA Task Force Officer Nathan Stinnett, who was present when Mitchell identified Marti's building and apartment, went to the apartment door and confirmed that it was, in fact, unit number 102.

(D.)  Also on April 19, 2018, DEA Task Force Officer Brian Metzger conducted a consent search of Mitchell's wireless/cellular telephone. Mitchell identified 865-250-8905 as the telephone number that he used to contact Marti to arrange drug purchases. A review of the text conversations between that number and Mitchell revealed that the two had set up a drug transaction at the apartment identified herein on April 13, 2018. TFO Metzger's review of previous texts between Mitchell and Marti further reflect that Marti and Mitchell had arranged to meet at Marti's residence on several other occasions. Moreover, these texts also reflect that Marti was familiar with, and had dealt drugs with "Tim," which, based on my training, experience, and knowledge of this investigation, I believe to be referring to Tim Thornton. In addition, these texts establish that Mitchell and Marti discussed the numbers "16" and "32," which I recognize as the number of ounces in one (1) and two (2) pounds, respectively.

(E.)  On April 20, 2018, TFO Metzger and myself interviewed a confidential source (CS1) regarding his knowledge of Thornton's drug trafficking activities. CS1 admitted to having purchased ounce quantities of meth from Thornton on an almost daily basis for an extended period of time prior to Thornton's incarceration. CS1 advised Thornton's source of supply was a female named "Marti" in Knoxville, Tennessee. CS1 was also able to identify Marti Jean Smith's operator's license photo as the person he knew to supply Thornton. CS1 stated that he went to Marti's apartment with Thornton on two (2) occasions to purchase meth. On the first trip, CS1 stated Thornton received four (4) one-gallon Ziploc-type bags containing meth from Marti. On the second trip, CS1 claimed a white male subject with glasses delivered a

6

box of meth to Marti's residence while they were there. CS1 was unsure how much of the box of meth was purchased by Thornton, but described the box as big enough that the male subject could not get his arms all the way around the box.

(F.) On April 23, 2018, I interviewed Lora Youngblood (Youngblood) at the DEA Office in London, Kentucky. TFO Metzger and Ms. Youngblood's counsel were also present for this interview. Youngblood is the girlfriend of Mitchell. Youngblood advised that she had been to Marti's apartment with Mitchell. Youngblood identified a photograph of the apartment complex located at 1222 Vista Ridge Way, Knoxville, Tennessee, as the place where Marti lived, and was also able to further identify the specific building in which Marti's apartment was located. Her identification was consistent with Mitchell's description. Youngblood further described where Marti's actual apartment was within this building. This information was also consistent. Youngblood confirmed Mitchell's prior buyer-seller relationship with Thornton, and stated that she had gone to Marti's apartment with them to obtain meth. Youngblood further confirmed that Mitchell began dealing directly with Marti after Thornton went to jail. Youngblood said that she went with Mitchell to Marti's apartment on two (2) separate occasions. Youngblood said both of these trips were for the purpose of acquiring meth, although she was not a witness to the actual exchange between Mitchell and Marti. Youngblood stated that Marti and Mitchell would go into Marti's bedroom to conduct business. Youngblood advised that she had been in Marti's bedroom on one (1) occasion to borrow a shirt and saw a safe in the closet.

(G.) On April 24, 2018, I contacted Tennessee Probation and Parole Officer Kelly Wood who is the supervising officer for Marti Jean Smith. A review of Marti Jean Smith's criminal history revealed that she is on probation as transferred from the State of Georgia. Additionally, the review indicated that at least part of the basis for Marti's status of probation

7

was for drug-related offenses.  Officer Wood further advised that Marti had previously failed a drug test for meth, and was actually currently in violation of her probation conditions.  Officer Wood confirmed that telephone number 865-250-8905, which is the telephone number provided by Mitchell, is the same number he had on file for Marti through her supervision, and that he knew Marti to reside at 1222 Vista Ridge Way, Apartment 102, Knoxville, Tennessee.

6.Based on the foregoing, I assert that there is probable cause to believe that Marti Jean Smith is engaged in the illegal distribution of meth, as well as being involved in a conspiracy to do the same, all in violation of 21 U.S.C. §§ 841(a)(1) and 846.  I further assert that there is probable cause to believe that evidence of these offenses is contained within Marti Jean Smith's residence located at 1222 Vista Ridge Way, Apartment 102, Knoxville, Tennessee, and I respectfully request this Court issue a search warrant for the same.

Richard A. J. Dalrymple
Task Force Officer
Drug Enforcement Administration

On this, the 25 day of April, 2018.

H. Bruce Guyton,
U.S. Magistrate Judge

Attachment A
Residence of Marti J. Smith, 1222 Vista Ridge Way, Apartment 102, Knoxville, Tennessee



From the junction of East Weisgarber Rd. and Middlebrook Pike NW (TN-169 W) travel west for 9/10 mile to the junction of Lake Brook Blvd. NW and turn right. Travel 3/10 mile to the junction Vista Ridge Way and turn right. Travel approximately 300 ft. to the last building on the right before the 90 degree left turn to the building marked 1222 (pictured above) to the apartment marked with number 102 on the ground floor with a black door (also pictured above).